UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Lauderdale Division)

CASE NO. _____ - Civ. (_____)

LAURENCE DINGMAN             **09-CV-61718-Zloch-Rosenbaum**
           Plaintiff,

v.

SBN SWFL, I, LLC, organized and
existing under the laws of Delaware
           Defendant

_____

```
FILED by   VT   D.C.
ELECTRONIC

Oct 28, 2009

STEVEN M. LARIMORE
CLERK  U.S.  DIST.  CT.
S. D.  OF  FLA. · MIAMI
```

COMPLAINT

Plaintiff Laurence Dingman ("Plaintiff") files his Complaint against Defendant, SBN

SWFL, I, LLC, organized and existing under the laws of Delaware ("Bank") as grounds therefore

states:

1. Plaintiff is a resident of Broward County, Florida.

2. Bank is organized and exists under the laws of Delaware. The term Bank will be used in

the complaint to also include Bank's predecessor in interest, Transland Financial Services, Inc. as

Bank is not a holder in due course and is subject to all claims that Plaintiff had against the originator

of the note and mortgage.

3. This court has diversity jurisdiction pursuant to 28 USC §1332 as the amount in

controversy exceeds $75,000.

4. This is an action for fraud in the inducement, declaratory relief, negligent

misrepresentation, fraudulent misrepresentation, breach of fiduciary duty, exploitation of the elderly

and unfair and deceptive trade practices relating to a Federal National Home Loan Mortgage which

states that it is governed by federal law.

5. Venue is proper in the Southern District of Florida as documents subject to interpretation were signed in Broward County, Florida; thus is the venue where the cause of action accrued. Plaintiff did not travel outside of Broward County, Florida in order to obtain the mortgage being sued upon and all communications were made to Plaintiff while he was in Broward County, Florida. Lender is an out of state corporation making and purchasing loans to residents of various cities and counties so should expect to have issues concerning those documents heard in the cities and counties where the borrowers reside.

General Allegations

6. Plaintiff signed a purchase and sale contract with Advantage Builders of America, Inc. ("Builder") for the purchase of a fully constructed residence ("Contract"). A copy of this contract is attached as Exhibit "A". Paragraph 4 provides that Plaintiff will close on the property as soon as Builder has completed construction and upon receipt of the certificate of occupancy.

7. Plaintiff was told that he was making application as required by paragraph 1 of the Contract. Bank's predecessor in interest mailed a note and mortgage to Plaintiff as part of the loan application process. A copy of the note and mortgage and assignments showing that Bank now owns the note and mortgage are attached as Exhibit "B".

8. The note was in reality a construction loan being made to the Builder. The Construction Rider to the Note shows that this loan in the amount of $263,700 was due at the longest possible time period in 12 months.

9. The Builder paid all payments due under the note until it obtained the certificate of occupancy (January 11, 2007) on the property or 1 ½ years later.

10.     Plaintiff was unaware that he had purchased property or borrowed $263,700 based upon a contract that stated he was to purchase a fully constructed home until he refused to close on the home when the builder demanded a couple thousand dollars more in "excess" costs.

11.     Upon Builder demanding "excess" costs, Plaintiff contacted the undersigned.

12.     Plaintiff's predecessor in interest, Transland Financial Services, Inc. started foreclosure in state court and then dismissed its action upon Plaintiff raising these general allegations and more specific allegations of how the Bank could make a construction loan based upon a contract that required Builder to deliver a fully constructed home.

13.     Plaintiff's predecessor in interest, Transland Financial Services, Inc. ("Transland") was forced into bankruptcy (Middle District of Florida, Case No. 6:08-bk-03834-ABB) by creditors. The Examiner's Report on Transland (document entry 172) found widespread fraud at Transland. The Examiner's Report also found that in order to create cash flow after 2004, Transland began granting construction to permanent loans as they generated additional fees. The Examiner's Report found that the construction to permanent loans resulted in additional income to officers and employees. The Examiner's Report found that even after federal court order concerning how to handle certain finances that Transland executives continued to improperly use corporate assets for personal use.

14.     Plaintiff never accepted delivery of title to the property although a deed is of public record transferring title from an entity called Madussa, LLC to Plaintiff. Plaintiff has repeatedly offered to transfer title to the Bank but the Bank has refused to accept title to the property.

15.     Plaintiff has never been in possession of the Property. The Builder has at all times retained possession of and keys to the Property.

16.     The Builder selected the Bank for Plaintiff to make loan application with.

17.    At the time that Plaintiff signed the contract, note and mortgage he was 73 years old.

## COUNT I – FRAUD IN THE INDUCEMENT

18.    Plaintiff reallages and incorporates paragraphs 1 – 17.

19.    Bank made false statements concerning material facts in that the "loan application" was in reality a construction loan for the Builder.

20.    Bank knew that the note and mortgage were in reality a construction loan for the builder but in order to obtain funding from its lenders needed to show a credit worthy borrower, instead of the Builder.

21.    The Bank knew that Plaintiff would sign the "loan application" documents mailed to him as there was no one to explain that these documents were not loan application documents.

22.    The Bank relied upon Plaintiff signing these documents in order to continue with the fraudulent scheme as found by the bankruptcy court.

23.    The Bank acted with careless and reckless disregard for the financial harm caused to Plaintiff and Plaintiff's previous impeccable credit history for its own financial gain.

WHEREFORE, Plaintiff requests that this Court find that Bank fraudulently induced Plaintiff to sign the note and mortgage so as to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage and award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract),  pre-judgment interest on the monies spent, and any and all other relief that this Court deems just and proper.

## COUNT II – DECLARATORY RELIEF

24.    Plaintiff reallages and incorporates paragraphs 1 – 17.

25. A bona fide, actual, present practical need exists for this declaration.

26. The requested declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

27. A right of Buyer is dependent upon the facts or the law applicable to the facts.

28. Bank and Plaintiff have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law;

29. The antagonistic and adverse interests are all before the court by proper process and that the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity

WHEREFORE, Plaintiff requests that this Court determine that Plaintiff has no obligations to the Bank pursuant the note and mortgage signed under the guise of a loan application pursuant to a contract that required a closing on upon issuance of a certificate of occupancy and cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract), pre-judgment interest on the monies spent, and any and all other relief that this Court deems just and proper.

## COUNT III –FRAUDULENT MISREPRESENTATION

30. Plaintiff reallages and incorporates paragraphs 1 – 17 and 19 - 23.

WHEREFORE, Plaintiff requests that this Court find that Bank fraudulently misrepresented the facts to him and induced to sign the note and mortgage so as to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract), pre-judgment interest on the monies spent, and any and all other relief that this Court deems just and proper.

## COUNT IV –NEGLIGENT MISREPRESENTATION

31.     Plaintiff reallages and incorporates paragraphs 1 – 17 and 19 - 23.

32.     Bank either sent the note and mortgage based upon a contract that required that Plaintiff only close on the property when it was fully completed, instead of as a construction loan, intentionally or without regard to the truth or falsity of the nature of the loan being made when it should have known that the loan being made was improper.

33.     Plaintiff justifiably placed his reliance in the Bank to act only in accordance with the terms of the Contract.

34.     The Bank intended Plaintiff to execute all the documents sent to him as instructed.

35.     Plaintiff, to his detriment and based upon his reliance that the Bank would not act improperly or outside the requirements of the Contract, executed the documents sent to him, including the note and mortgage.

WHEREFORE, Plaintiff requests that this Court find that Bank fraudulently misrepresented the facts to him and induced to sign the note and mortgage so as to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract), pre-judgment interest on the monies spent, and any and all other relief that this Court deems just and proper.

## COUNT V – BREACH OF FIDUCIARY DUTY

36.     Plaintiff reallages and incorporates paragraphs 1 – 17, 19 – 23 and 32 – 35.

37.     Bank had superior knowledge in the making of loans pursuant to real estate contracts.

38.    Plaintiff relied upon Bank to protect itself as well as Plaintiff in honoring the terms of the Contract and not making a loan in violation of the Contract terms.

39.    Bank, nor anyone acting on behalf of the Bank, explained to Plaintiff that the loan application was actually a construction loan that was being made to deceive Bank's warehouse lenders and to personally benefit Bank's officers and employees.

40.    Bank was secretly acting in its own personal financial interests and in total disregard to the Contract terms; something that Plaintiff could not possibly have known.

41.    Plaintiff reliance on the Bank to only make a loan in accordance with the Contract when Bank was secretly making loans for their own personal interest was a breach of its duty to Plaintiff.

WHEREFORE, Plaintiff requests that this Court find that Bank breached its duty to him by its failure to disclose that the note and mortgage where not the loan application required by the Contract so as to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract), pre-judgment interest on the monies spent, and any and all other relief that this Court deems just and proper.


## COUNT VI – EXPLOITATION OF THE ELDERLY

42.    Plaintiff reallages and incorporates paragraphs 1 – 17, 19 – 23, 32 – 35 and 37 – 41.

43.    Plaintiff is a vulnerable adult as defined by §415.102(26) in that he is in need of protection due to the infirmities of aging.

44.  Bank exploited Plaintiff as Bank was in a position of trust and confidence and yet knowingly, by deception, obtained and used Plaintiff's funds and assets with the intent to permanently deprive him of the benefit thereof.

WHEREFORE, Plaintiff requests that this Court find that Bank abused him so as to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract), pre-judgment interest on the monies spent, attorney's fees, punitive damages per §415.111, attorney's fees and any and all other relief that this Court deems just and proper.


## COUNT VII – UNFAIR AND DECEPTIVE TRADE PRACTICES

45.      Plaintiff reallages and incorporates paragraphs 1 – 17, 19 – 23, 32 – 35, 37 – 41, 43 and 44.

46.      Bank's actions have already been found by a federal bankruptcy examiner to be fraudulent and self serving in order to generate cash flow for its officers.  These acts are unconscionable, unfair and deceptive.

WHEREFORE, Plaintiff requests that this Court find that Bank's practices were unconscionable, unfair and deceptive done with the intent to continue with its fraudulent business practices and benefit itself; cancel the note and mortgage, award him all the monies that he spent (other than the $350 deposit he agreed to place at risk per the Contract),  pre-judgment interest on the monies spent, attorney's fees, award restitution of all sums paid, Award the Department of Legal Affairs the civil penalties provided for in §501.2077, Florida Statutes, and any and all other relief that this Court deems just and proper.

DATED:  October 27, 2009.

BY: _____

Brenda Cox
Fla. Bar No. 817406
Attorney for Plaintiff
2499 Glades Road, Suite 110
Boca Raton, FL 33431
Telephone:  (561) 391-5350
Facsimile:   (561) 338-9335
Email:  brendacox@classic-title.com

Exhibit "A"

## ADVANTAGE BUILDERS of America, Inc.   License # CBC057313

## CONTRACT

This agreement made and entered into by Advantage Builders of America, Inc. and/or it's assigns whose address is 12651 Metro Pkwy, Suite #2, Ft. Myers, Florida, 33912, herin after referred to as SELLER, and

**Laurence Dingman**

Whose address is:            **9150 B SW 23**
                                             **Ft. Lauderdale, FL  33324**
                                             **(954) 817-6881**

WITNESSETH:

Subject to the terms and conditions hereinafter set forth, PURCHASER agrees to purchase and SELLER agrees to sell to PURCHASER a completed unit on the property legally described as

Lot(s):          **44-45**
Block:          **2425**
Unit:             **34**

as recorded in the Public Records of Lee County, Florida. Also known as:

**1134 NE 4th Place**
**Cape Coral, FL  33909**
*Lot Contract Expires:*   7/30/2005

The completed unit will be a:   Osprey TL

The details of material and construction to be equal to or better than those used in the home which has been approved in accordance to the guidelines set forth by The Department of Federal Housing and Urban Development on which they based a valuation of a home.

The completed unit will consist of CBS construction with cementuous exterior finish; tile flooring in wet areas per plans, carpeting and padding in living area and bedroom(s); custom cabinets; central heating and air conditioning; range, refrigerator, and dishwasher; tankless hot water heater; washer/dryer hookups in duplexes, washer/dryer hookups and units in singlefamily homes; well with pump and pressure tank and/or green sand filter, 200 gallon aerator, reverse osmusis system and water softener, or water meter, meter deposit, and waterline from meter to house as required by the lot; complete septic system, or sewer tap fees and sewer line from meter to house as required by the lot; a 1-2-10 year homeowner's warranty for FHA homes, 8,000 square feet of sod, two trees and twelve shrubs. Insulation shall be a minimum of R-19 in the ceiling on duplexes and a minimum of R-30 in the ceiling on single family homes and R-4.2 in the exterior walls.

| | | |
|---|---|---|
| Job #   1439 | Purchase Price: | $176,900.00 |
| | Lot Allowance:  RE: Assigned Lot $88500 | $0.00 |
| | | $0.00 |
| | | $0.00 |
| | Options per attached Addendum: | $10,625.00 |
| | Total Purchase Price: | $187,525.00 |
| | Down Payment with Contract: | $350.00 |
| | Balance To Close: | $187,175.00 |

*Realtor Commission paid by Seller at Front Closing of $5217 due RE/Action Realty Group, Inc.*

**Builder to pay up to $3,000 in closing costs.**
**Builder to pay interest during construction.**
**Builder to pay 5217 in re fees.**

*Seller has selected the following title company as the closing agent for this transaction:*

In the event that  PURCHASER fails to close, SELLER shall retain all monies paid by PURCHASER and PURCHASER shall further pay to SELLER an amount equal to SELLER'S out-of-pocket and internal costs and expenses incurred from the date of this contract as liquidated damages and agreed damages and not as a penalty or forfeiture. The SELLER shall be entitled to all rights and remedies available herunder at law and in equity.  PURCHASER agrees that additional fees may be applied by SELLER upon a lot inspection.  Pricing in this contract is valid for 60 days from the original date of the contract.

Price Expires:     **07/30/05**

PURCHASER has read this contract.  The undersigned PURCHASER has read and understands the entire contract and states that no representation, promise or agreement not expressed in this Contract has been made to induce the undersigned to enter into this Contract.

_____  8-15-05_____        _____   Date
**Laurence Dingman**                  Date

                                                                    _____   Date

_____             _____   Date
**Advantage Builders of America, Inc.**           Date

| | | |
|---|---|---|
| **Printed:**  8/11/2005 12:03:06 PM | Advantage Builders of America, Inc. | *Page 1 of 4* |
| **Created:**  4/28/2005 3:59:38 PM | License # CBC057313 | |
| | Salesperson:   Erik Eisea | |

11 of 37

# ADVANTAGE BUILDERS of America, Inc.  License # CBC057313

## CONTRACT

1. Purchaser agrees to make application, when directed, with an approved bona fide lending institution and to execute all necessary papers for a mortgage loan on the described property in the amount necessary to complete the purchase. The Purchaser agrees to pay all loan costs, including but not limited to survey certificates, origination fee, abstract or title insurance, intangible tax, documentary stamps on the mortgage, recording fees, credit report, appraisal loan charges made by the lending institution. Purchaser will be liable for any and all interest accrued on the construction loan five business days after the Certificate of Occupancy.

2. The Lender will make Purchaser aware of options as to locking in the prevailing rate of interest or floating at the prevailing interest rate. There are no guarantees given by the Seller either written or implied as to the interest rate.

3. The Purchaser will furnish hazard insurance (if applicable) to lender at closing and thereafter, to keep the above property insured at all times after taking possession. Seller will maintain General Liability insurance to $1,000,000 and Workes Comp to $100,000.

4. The work on this unit will begin upon Purchaser obtaining financing and the receipt of a building permit. Purchaser agrees to close the transaction as soon as Seller has completed construction of the property and upon receipt of the certificate of occupancy. Purchaser is responsible for any and all construction interest 5 days after issuance of the certificate of occupancy. The work shall be substantially completed within 180 business days, unless Seller is otherwise delayed.

5. Possession of the premises shall be delivered to the Purchaser when all monies due Seller have been paid and upon the Units substantial completion and receipt of a certificate of occupancy from the building authority for the County of Lee, State of Florida. Purchaser or Purchaser's representative will be given the opportunity to examine the Unit within seven (7) days prior to the Closing. At the inspection, Purchaser will sign an inspection statement listing any incomplete items or defects in workmanship or materials that  do not meet applicable building codes. Seller, will, within sixty (60) days after closing, correct noted items that do not comply with building codes applicable to the Unit.  Seller's duty to correct incomplete items or defects in workmanship or materials that do not meet applicable building codes shall survive the closing.  Occupancy prior to final settlement constitutes full and complete acceptance of residence by the Purchaser.

6. Punch-out work that does not interfere with occupancy, such as, but not limited to, paint touch-up, plaster repair, etc. shall not be a bona fide reason for Purchaser to delay final closing. If Purchaser delays final settlement and closing due to punch-out work that does not interfere with occupancy, then Purchaser shall be in default of this Agreement and this Agreement will be terminated. All monies paid by Purchaser will be retained by Seller. Punch Out work shall be scheduled and completed by Seller within sixty (60) days after closing. Should Purchaser take possession and/or occupy residence prior to settlement and closing, and prior to submitting and acceptance by Seller in writing a compliance list, Purchaser has accepted the home in "AS IS" condition and Seller is not obligated to perform the work. See #5.

7. Purchaser acknowledges that construction of dwelling will be in substantial conformity with engineered plans and that minor variations may occur. Seller reserves the right to substitute material, equipment, and fixtures of equal or better quality for materials, equipment, and fixtures specified in the plans or specifications.  Changes to plans may be required  to accomodate Septic or Building code changes and requirements. These include the removal of walls or adjustments to floor plans in 4th bedrooms or studies per the building or health department requirements. Purchaser acknowledges and Seller reserves the right to modify plans without notice.

8. Purchaser shall not hold Seller responsible to remove any trees of any type, excess vegetation, dirt, rocks of any type, boulders of any type, stone of any type that remains on the property once a certificate of occupancy has been issued. Purchaser shall not hold Seller responsible to fill or backfill any low-lying land whether natural or man-made after a certificate of occupancy has been issued.

9. Seller does not expressly imply or warrant habitability of soil or sub-surface conditions of the subject property. Purchaser expressly assumes the risk of any and all loss or damage to the subject property caused by water, soil, or sub-surface conditions, whether or not any such adverse conditions could have been discovered prior to the closing.

10. The Purchaser agrees to hold Seller harmless for any assessments or betterment fees levied against the property as of this Agreement date (sewer, water, roads, etc.)

11. Seller is not responsible for the quality of the water or the quality of and the longevity of the sod or landscaping. Nor is Seller responsible when equipment (water equipment, septic system, etc.) is neglected, abused or misused.

12. Seller guarantees all workmanship and materials for one year from the date of the issuance of the certificate of occupancy or the earlier of the dates if occupied by Purchaser before the issuance of the certificate of occupancy. Seller's liability under this guarantee is limited only to the cost of repair of any defective item built or installed pursuant to this Agreement, except those items covered by a separate manufacturer's warranty or guarantee. All manufacturer's warranties shall continue in force and effect according to their titles. Seller hereby expressly disclaims any and all implied warranties or merchantability and fitness of premises for use for particular purpose.  Any warranty claim must be made in writing to Seller and Seller must be given the opportunity to first remedy the situation, otherwise the Warranty is void.  Warranty may be transfered, however, Seller must be notified in writing and paid the transfer fee at least 10 days prior to close of sale of property.

Any labor and/or materials furnished by Purchaser which is not included in this Agreement, or which is part of any allowance and is paid by the Purchaser, is excluded from this warranty. The Purchaser agrees to hold Seller harmless for any latent defects (i.e. punch-out work manufacturing warranties, etc.). It is stressed, however, that normal characteristic behavior of building materials, wear and tear, general maintenance and like items, will not constitute latent defects.

Seller shall not be responsible or liable for any consequential or secondary damages and/or losses which may arise from or out of any and all defects including, but not limited to, personal injury or damage to personal property. Porches, patios, walks, drives, and even foundation can develop minor cracks during warranty period. These small cracks are normal and should be expected and are therefore not warrantable condition. The origin of these cracks varies but is usually related to normal initial differential settlement. Concrete driveways and concrete drive aprons are designed and constructed for normal single axle vehicular traffic. Excess axle weight loads will result in cracking at the junction and such cracks are also non-warrantable.

13. Should a garbage disposal be installed in a home with a septic system, any and all warranties, written or implied, regarding the septic system shall be deemed null and void at the time the garbage disposal is installed. Purchaser shall hold Seller harmless and will indemnify Seller regarding the septic system if a garbage disposal is installed at any time. This document will prevail over any and all warranties that are provided for or purchased on behalf of the Purchaser.

14. Due to insurance regulations, Purchaser is not permitted on the job site or premisis unless accompanied by Seller.  Also, Purchaser shall not discuss construction matters with the Seller' subcontractors, such as adding, changing quality or pricing anything related to the unit. No representation by a subcontractor shall be binding upon the Seller. The Purchaser shall release the Seller and its agents and employees from any and all liability for damages, or injury sustained to the property or by a third party brought on the property by the Purchaser

| Initials | Date | Initials | Date |
|---|---|---|---|
| _FAP_ | _8-15-06_ | | |
| Initials | Date | Initials | Date |

Printed:    8/11/2005 12:03:06 PM          Advantage Builders of America, Inc.                          Page 2 of 4
Created:    4/28/2005 3:59:38 PM                    License # CBC057313
                                                            Salesperson:   Erik Eisea

12 of 37

## ADVANTAGE BUILDERS of America, Inc.   License # CBC057313

### CONTRACT

15. The location of the Garage (Garage on Left side vs. Garage on Right side of house) is dictated by the combination of the location of the source of power (as defined by the power company) and neighboring septics and wells. Buyer may specify either Garage Left or Garage Right, but it must be included as a change item on the addendum to the contract (page 4). If the Garage location requested is different than the location defined by the power company and neighboring septics and wells, then additional fees will apply. If Garage location is not specified, the default location as dictated by the location of power, neighboring septic, wells and builder discretion will be used.

16. Homes will be centered on the lot facing the road utilizing standard minimum setbacks of 25 to 40 feet depending on the model and minimum setback requirements. Setback requirements are dictated by the building department and well & septic requirements. Builder may adjust the placement of the home on the lot at builders discretion. For acreage or oversized properties, builder will place the home at Builders discretion unless specified and included as a change item on the addendum to the contract (page 4). Additional fees will apply for custom placement of the home on the property.

17. No changes to the contract will be accepted after the earlier of a) the ordering of engineered prints, b) the front closing of the construction loan, c) the beginning of construction or d) 10 days after signature of the contract. This includes color choices as indicated on the color sheet.

18. Seller has made no independent inspection of the property to determine the presence of conditions which may result in radon gas; however, Seller is not aware of any such condition. Certain building methods and materials have been proven to reduce the possibility of radon gas entering the home. Radon is a naturally occurring radioactive that, when it has accumulated in a home in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in homes in Florida. Additional information regarding radon and radon testing may be obtained from the county health unit.

19. While unlikely, Seller reserves the right to make changes to floor plans, engineered prints, features and materials without notice.

20. Buyer may not make changes to the floorplan, add upgrades, or add change order items either within 10 days of buyer signing the contract or if engineered prints have been ordered, which ever is earlier. No color changes will be accepted after the front construction closing. If a signed color sheet is not completed at the front closing then the default color sheet selections will be used.

21. Florida Homeowners' Construction Recovery Fund. Payment may be available from the Florida Homeowners' construction recovery fund if you lose money on a project performed under contract, where the loss results from specified violations of Florida Law by a licensed contractor. For information about the recovery fund and filing a claim, contact the Florida Construction Industry Licensing Board at the following Telephone number and Address: (850) 487-1395; 1940 North Monroe Street, Tallahassee, FL 32399-1039

22. It is expressly agreed that this Agreement constitutes the sole understanding between the parties hereto and that no oral understanding, representation, promise or any other statement whatsoever being made by anyone whosoever shall be binding upon Seller unless same is contained herein or in another instrument attached hereto and made a part of this Agreement and duly signed by all parties. Revisions to this Agreement shall be in writing, executed by all parties and attached hereto as an addendum.

23. Purchaser agrees to reimburse Seller for any government impact fees enacted after Agreement date where Seller becomes unable to obtain permits without the payment of such fees.

24. Purchaser is responsible for any application, engineering or other fees required to address an ERP situation, including price increases. In addition, Purchaser is responsible for construction interest due to time delays required to address an ERP situation. Purchaser is responsible for additional fees required to implement changes to the site plan, floor plan, driveways, walkways, etc. required or requested by the county or DOT. Purchaser is responsible for additional fees required to provide power to the site and any interest due to time delays required to provide power.

25. It is expressly agreed that the Seller retains the right to cancel this Agreement prior to construction without cause and without recourse from Purchaser.

26. Arbitration of Disputes. In the event of any dispute arising out of the performance of this agreement, whether based in operating agreement, tort, or other body of law, the parties agree that any dispute will first be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) or if applicable, by similar state statute, and not by or in a court of law. All decisions respecting the arbitrability of any dispute will be decided by the arbitrator. The arbitrator will have the right to award reasonable attorney's fees and expenses, including those incurred in mediation, arbitration, trial, or on appeal

27. Governing Law: This Agreement shall be governed by the laws of the state of Florida.

28. Attorney's Fees and costs: In connection with any litigation including appellate proceeding arising out of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

29. All gas, oil, and mineral rights remain with the grantor.

_Laurence Dingman_     8-15-05        _____
Laurence Dingman     Date            Date

_signature_     _____ Date       _____ Date
Advantage Builders of America, Inc.  Date

Steven J. Magner     _____ Date

| | | |
|---|---|---|
| Printed: | 8/11/2005 12:03:06 PM | Advantage Builders of America, Inc. |
| Created: | 4/28/2005 3:59:38 PM | License # CBC057313 |

Salesperson:  Erik Elsea     Page 3 of 4

## ADVANTAGE BUILDERS of America, Inc.   License # CBC057313

### Addendum to Contract

Job #   1439   Model:   Osprey TL

This is an addendum to the attached contract between Advantage Builders of America, Inc. and/or it's assigns whose address is 12651 Metro Pkwy, Suite #2, Ft. Myers, Florida, 33912, here in after referred to as SELLER, and:

Laurence Dingman

Hereinafter referred to as Purchaser.

| Ref # | Status | Date | Room | Feature | Item | |
|---|---|---|---|---|---|---|
| 2 | ** New ** | 4/28/2005 3:59:38 P | Exterior | Exterior | Irrigation System (80 x 125 lot) | $0.00 |
| 5 | ** New ** | 4/29/2005 12:17:11 | Exterior | Exterior | Under Truss Lanai | $6,600.00 |
| 3 | ** New ** | 4/28/2005 3:59:38 P | General | Electrical | Pre-wire for Security System | $0.00 |
| 1 | ** New ** | 4/28/2005 3:59:38 P | General | General | Standard Mini Blind Package | $0.00 |
| 4 | ** New ** | 4/29/2005 12:17:03 | General | Lot Financing | Lot Financing Charge (Lot 80,001 to 90,000) | $4,025.00 |

Total Change Order Fees:   $10,625.00

### Items / Changes Removed from the previous contract
The Items below will not be implemented and are noted on the contract for reference purposes only.

The changes and total stated above are paid upon signing of this Addendum by Check or Money Order # _____ if changes have been made after submitting to Engineering or after the front end construction closing.  If submitted prior to these events the purchaser agrees to add to financing to complete these changes.

_Laurence Dingman_   8-15-05
Laurence Dingman                Date                                              Date

_____   Date        _____   Date
Advantage Builders of America, Inc.        Date

Printed:   8/11/2005 12:03:06 PM
Created:   4/28/2005 3:59:38 PM
Advantage Builders of America, Inc.   License # CBC057313
Salesperson:   Erik Elsea
Page 4 of 4

14 of 37

Exhibit "B"

NOTE

LOAN NUMBER:    05036823
BORROWER:    1000817909150288237

**AUGUST 17, 2005**          FT MYERS          FLORIDA
[Date]                       [City]                        [State]

3134 NE 4TH PLACE, CAPE CORAL, FL 33909
[Property Address]

SEE ATTACHED *** RIDER TO NOTE

**1. BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $   263,700.00
(this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    TRANSLAND
FINANCIAL SERVICES, INC.

I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer
and who is entitled to receive payments under this Note is called the "Note Holder."
**2. INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay
interest at a yearly rate of      ***      %.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described
in Section 6(B) of this Note.
**3. PAYMENTS**
    (A) Time and Place of Payments
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the      ***      day of each month beginning on
***          . I will make these payments every month until I have paid all of the principal
and interest and any other charges described below that I may owe under this Note. Each monthly payment will be
applied as of its scheduled due date and will be applied to interest before Principal. If, on      ***
I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity
Date."
    I will make my monthly payments at      2701 MAITLAND CENTER PKWY, STE.
300, MAITLAND, FL 32751-7294

or at a different place if required by the Note Holder.
    (B) Amount of Monthly Payments
    My monthly payment will be in the amount of U.S. $      ***
**4. BORROWER'S RIGHT TO PREPAY**          See Attached Rider to Note
**5. LOAN CHARGES**
    If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the
interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits,
then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;
and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note
Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct
payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.
**6. BORROWER'S FAILURE TO PAY AS REQUIRED**
    (A) Late Charge for Overdue Payments
    If the Note Holder has not received the full amount of any monthly payment by the end of
15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of
the charge will be      5.000      % of my overdue payment of principal and interest. I will pay this late
charge promptly but only once on each late payment.
    (B) Default
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
FLORIDA FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3210 1/01
DOCUKNC1                                           (page 1 of 3 pages)
DOCUKNC1.VTX  14/11/2001

NOTE

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

FLORIDA FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3210 1/01
800583(C)    (page 2 of 3 pages)
DOCMAGIC.VTX  03/11/2011

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
-Borrower LAURENCE DINGMAN

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF:

WITHOUT RECOURSE
TRANSLAND FINANCIAL SERVICES, INC.

BY:_____
BENJAMIN LEE WOFFORD
VICE PRESIDENT

FLORIDA FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3210 1/01
DOC003C1                                                          *(page 3 of 3 pages)*
BROKERSW..FRM   03/23/2001

Aug. 11. 2005  8:42AM   TRANSLAND FINANCIAL                     No. 7031   P. 8/31

"EXHIBIT A"
CONSTRUCTION RIDER TO NOTE

Borrower       LAURENCE DINGMAN

Lender:        TRANSLAND FINANCIAL SERVICES, INC., (the "Lender")

Date of Note:  August 17, 2005

WHEREAS, BORROWER has executed the Note (the "NOTE") to which this Rider is made, together with a MORTGAGE (the "MORTGAGE") of even date therewith securing the NOTE, in connection with a loan to BORROWER from LENDER.

The parties agree as follows:

1.     PAYMENT OF PRINCIPAL AND INTEREST: Interest shall be payable at the rate of **3.500%** over the "Prime Rate" as hereinafter defined and shall be subject to change on a daily basis. In no event will the interest rate fall below 8.500%. Interest only shall be calculated on a daily basis and be payable monthly, commencing **September 1, 2005** continuing on the first day of each month thereafter until the "Modification Date" as hereinafter determined, at which time principal and interest shall be paid in accordance with the modification (as provided in paragraph 2 of this Rider) to the NOTE.

1.1     For the purpose hereof, "Prime Rate" shall mean the rate of interest as established from time to time and shown in the Wall Street Journal. A certificate of LENDER as to the Prime Rate in effect on any day shall be conclusive for purposes hereunder as to the Prime Rate in effect on such date.

2.     INTEREST RATE AMORTIZATION, TERM ADJUSTMENT, AND THE MODIFICATION DATE: BORROWER and LENDER agree that the NOTE and MORTGAGE shall be modified by a Modification Agreement to be executed by BORROWER at LENDER's request, upon the date of the first to occur of the following events (referred to herein as the "Modification Date"):

2.1     The final inspection by the appropriate governmental authority certifying compliance of the completed improvements with applicable governmental regulation, or

2.2     Issuance of a CERTIFICATE OF OCCUPANCY, or

2.3     Occupancy by the BORROWER of the subject premises, or

2.4     12 months from the date of this NOTE.

The Modification Agreement shall modify the terms of the NOTE as follows:

2.5     The interest rate shall be adjusted so as to provide that the interest rate shall coincide to the prevailing interest rate for similar mortgage loans made by the LENDER, Transland Financial Services, Inc., in accordance with the requirements of the LENDER.

2.6     The maturity date shall be adjusted so as to provide for a 360 month remaining term of the MORTGAGE.

2.7     The amortization shall be modified so as to provide the amortization of principal and interest over the full remaining 360 month term of the MORTGAGE, in accordance with the requirements of LENDER.

3.     DEFAULT: Failure of BORROWER to complete construction within 12 months from the date of this NOTE or to execute the Modification Agreement and such other instruments as shall be reasonable required in connection therewith by the LENDER, within fifteen (15) days of the Modification Date, shall constitute a default and the outstanding principal balance plus accrued interest of the NOTE and MORTGAGE shall be immediately due and payable without further notice to BORROWER. In the event of a default, the outstanding principal balance shall bear interest at the highest rate allowable under FLORIDA law. LENDER shall also be entitled to exercise all remedies provided in the MORTGAGE and NOTE, or, as is otherwise available to it at Law or in equity, in the event of default of the BORROWER.

4.     In the event the loan does not modify (convert from a construction to permanent loan status), a prepayment penalty of 1.5% of the loan amount will be charged at the time of payoff.

5.     LENDER'S RESCISSION RIGHT: If any provision of this Rider shall be contrary to the requirements now or hereafter established for sale of the NOTE and the MORTGAGE securing it to any secondary market investor, this Rider shall be deemed null and void and the provision hereof shall terminate immediately.

| | |
|---|---|
| _____ | 08/17/2005 |
| Borrower    LAURENCE DINGMAN | Date |
| _____ | 08/17/2005 |
| Co-Borrower | Date |
| _____ | 08/17/2005 |
| Co-Borrower | Date |
| _____ | 08/17/2005 |
| Co-Borrower | Date |

swft9OPRPIJ\d.DOC 05-17-2005                                     Loan No: 06CORRECT

WHEN RECORDED MAIL TO:
TRANSLAND FINANCIAL
SERVICES, INC.

2701 MAITLAND CENTER
PKWY, STE

MAITLAND, FL
32751-7294
ATTN:   JUDY M. HAYNES

THIS DOCUMENT WAS PREPARED BY:
JILL LEWIS

TRANSLAND FINANCIAL
SERVICES, INC.

2701 MAITLAND CENTER
PKWY, STE. 300

MAITLAND, FL
32751-7294

INSTR # 2005000049333, Pages 16
Doc Type MTG, Recorded 10/03/2005 at 08:53 AM,
Charlie Green, Lee County Clerk of Circuit Court
Mtg Doc: $922.95 Int. Tax $527.40  Rec. Fee $137.50
Deputy Clerk LFAHRNER
#2

#01-05-0054

---

[Space Above This Line for Recording Data]

## MORTGAGE

DINGMAN
LOAN #: 05028823
MIN:   100081700050288237
PIN:   014423C3024250440

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  AUGUST 17, 2005                , together with all riders to this document.
(B) "Borrower" is LAURENCE  DINGMAN, A MARRIED MAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel.  (888) 679-MERS.
(D) "Lender" is  TRANSLAND FINANCIAL SERVICES, INC.

Lender is a  CORPORATION                                     organized and existing under the laws of
FLORIDA                        . Lender's address is  2701 MAITLAND CENTER
PKWY, STE. 300 MAITLAND, FL 32751-7294
(E) "Note" means the promissory note signed by Borrower and dated  AUGUST 17, 2005
The Note states that Borrower owes Lender
TWO HUNDRED SIXTY-THREE THOUSAND SEVEN HUNDRED AND 00/100
Dollars (U.S. $ 263,700.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 1, 2036

FLORIDA — Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01
DOCUKFL1.VTX  08/11/2004                     (Page 1 of 13 pages)

05028823

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☒ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☒ Other(s) [specify] CP RIDER TO NOTE (EXHIBIT A)

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010.1/01
DOCUKFL2.VTX 08/07/2004    (Page 2 of 13 pages)

21 of 37

05028823

as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
COUNTY                                                      of    LEE
                    (Type of Jurisdiction)                                        (Name of Jurisdiction)
LOTS 44 AND 45, BLOCK 2425, UNIT 34, CAPE CORAL
SUBDIVISION, ACCORDING TO THE PLAT THEREOF AS RECORDED
IN PLAT BOOK 16, PAGES 74 TO 86, INCLUSIVE, IN THE
PUBLIC RECORDS OF LEE COUNTY, FLORIDA.


Subject property is not the homestead of the Grantor(s) under the
laws and constitution of the State of Florida in that neither
Grantor(s) or any member of the household of Grantor(s) reside
thereon.


which currently has the address of    1134 NE 4TH PLACE
                                                          [Street]
CAPE CORAL                                  , Florida    33909                     ("Property Address").
        [City]                                                      [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.

FLORIDA -- Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                        Form 3010 1/01
DOCMU.vtx 08/07/2004                        (Page 3 of 13 pages)

05028823

Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01

EC6185FL.VTX 08/16/2004         (Page 4 of 13 pages)

05028823

Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKFL.VTX 04/18/2004                (Page 5 of 13 pages)                                   Form 3010 1/01

05028823

of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01
DOCUKFL.VTX 06/16/2004                                (Page 6 of 13 pages)

05028823

or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     Form 3010 1/01
DOCUKFL7.VTX 06/16/2004                         (Page 7 of 13 pages)

05028823

agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01
DOCUKFL.VTX 06/15/2004                              (Page 8 of 13 pages)

05028823

in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  Loan Charges.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and evaluation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  Notices.  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be

FLORIDA -- Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3010 1/01
DOCUKFLY.VTX 06/16/2004                                        (Page 9 of 13 pages)

05028823

only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more

FLORIDA – Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3010 1/01
DOCUKFLTX 06/16/2004                                    (Page 10 of 13 pages)

29 of 37

05028823

changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 a the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without

FLORIDA — Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01
DOCUPREP VTX 06/16/2004                    (Page 11 of 13 pages)

30 of 37

05028823

further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____   8-15-05
-  BORROWER  -  LAURENCE DINGMAN  -  DATE  -

Signed, sealed and delivered in the presence of:

_____          _____
Witness # 1                                                    Witness # 2

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01
DOCUMENT.vtx  08/07/2004                              (Page 12 of 13 pages)

05028823

[Space Below This Line for Acknowledgment]

State of _FLORIDA_
County of _BROWARD_

The foregoing instrument was acknowledged before me this _1S    August    2005_    by

      Lawrence Dingman, a married man

who is personally known to me or who has produced _drivers license_ _____ as identification.
_AND who did not take an oath._    _D525-534-32-171-0_

```
┌─────────────────────────────────┐
│         RICARDO BERL             │     Notary
│   MY COMMISSION #DD422312        │     Title
│     EXPIRES: APR 25, 2009        │
│  Bonded through 1st State Insurance │
└─────────────────────────────────┘
```

_SEAL_

My Commission Expires:
_Apr 25, 2008_

FLORIDA – Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3010 1/01
DOCUKFL13.VTX  08/11/2004      (Page 13 of 13 pages)

32 of 37

# SECOND HOME RIDER

DINGMAN
LOAN #: 05026823
MIN:    100081700050288237

THIS SECOND HOME RIDER is made on this 17TH   day of   AUGUST, 2005     ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether
there are one or more persons undersigned) to secure Borrower's Note to   TRANSLAND
FINANCIAL SERVICES, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument (the "Property"),
which is located at:
1134 NE 4TH PLACE, CAPE CORAL, FL 33909

(Property Address)

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further
covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the
following:

    **6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home.
Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times,
and shall not subject the Property to any timesharing or other shared ownership arrangement or to any
rental pool or agreement that requires Borrower either to rent the Property or give a management firm
or any other person any control over the occupancy or use of the Property.

    **8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application
process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's
knowledge or consent gave materially false, misleading, or inaccurate information or statements to
Lender (or failed to provide Lender with material information) in connection with the Loan. Material
representations include, but are not limited to, representations concerning Borrower's occupancy of
the Property as Borrower's second home.

MULTISTATE SECOND HOME RIDER- Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3890 1/01
DOCURSA1
DOCURSA1.VTX 11/13/2004                                         Page 1 of 2

33 of 37

Prepared by and return to:
Mitchell E. Grodman, Esquire
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
450 South Orange Avenue, Suite 250
Post Office Box 2809
Orlando, FL 32802-2809
(407) 843-4600

## ASSIGNMENT OF MORTGAGE

This Assignment of Mortgage (the "Assignment") is made by MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., with its principal place of business located at P.O. Box 2026, Flint, Michigan 48501 (the "Assignor"), in favor of TRANSLAND FINANCIAL SERVICES, INC., a Florida corporation with its principal place of business located at 2701 Maitland Center, Maitland, Florida 32751 (the "Assignee").

In consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, bargains, sells, conveys, assigns, transfers, and sets over unto Assignee, all of its right, title, and interest in and to that certain Mortgage dated August 17, 2005 by LAURENCE DINGMAN, A MARRIED MAN in favor of Assignor recorded on the 3rd day of October 2005 in the Public Records of Lee County, Florida, (the "Mortgage"), in Official Records INSTRUMENT # 2005000049333.

TO HAVE AND TO HOLD the same unto ASSIGNEE, its successors and assigns, forever.

IN WITNESS WHEREOF, the said Assignor has duly executed this Assignment as a sealed instrument as of _____July 13_____, 2007.

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.

By: _____
Name: Delana J. Johnson
Title:  Sr. Vice President

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this 13th day of _____July_____, 2007, by Delana J. Johnson, Sr. Vice President, of Transland Financial Services, Inc. on behalf of said entity. She is personally known to me or has produced _____ as identification.

(NOTARY SEAL)

Christy Lynn Brodie
My Commission DD298517
Expires March 09, 2008

Notary Public Signature

_____
(Name typed, printed or stamped)
Notary Public, State of _____
Commission No.: _____
My Commission Expires: _____

0014965/129923/1073512/1



Charlie Green, Lee County Clerk of Circuit Court, Rec. Fee $10.00 Deputy
Clerk TBAER

This instrument prepared by:
Transland Financial Services, Inc.

When recorded, please return to:
TierOne Bank
Attn: Credit Administration
1235 "N" Street
Lincoln, NE 68508

## ASSIGNMENT OF SECURITY INSTRUMENT/MORTGAGE/DEED OF TRUST

TOB#:0115241053                                    Loan#: 05028823

FOR VALUE RECEIVED, TRANSLAND FINANCIAL SERVICES, INC. ("Assignor),
its successors and assigns, hereby assigns and transfers to TIERONE BANK, a federally
chartered savings bank (herein "Assignee") whose address is 1235 "N" Street, Lincoln, NE
68508, its successors and assigns, all of its rights, title and interest in and to a certain Security
Instrument executed by LAURENCE DINGMAN, A MARRIED MAN and bearing the date of
record August 17, 2005 and recorded on the 3rd day of October of A.D. 2005 in the office of the
Recorder of Lee County, State of FL in INSTRUMENT # 2005000049333.

Such security having been given to secure payment of $263,700.00.

                                        TransLand Financial Services, Inc.
                                        (Assignor)

                                        By: _____
                                        Name: Delana J. Johnson
                                        Title: Sr. Vice President

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this 13th day of July,
2007, by Delana J. Johnson, Sr. Vice President, of TransLand Financial Services, Inc. on behalf
of said entity. She is personally known to me or has produced _____ as
identification.

(NOTARY SEAL)                           _____
                                        Notary Public Signature

                                        _____
Christy Lynn Brodie                     (Name typed, printed or stamped)
My Commission DD298617                  Notary Public, State of _____
Expires March 09, 2008                  Commission No.: _____
                                        My Commission Expires: _____

0014965/129923/1072515/1

EXHIBIT "D"

When recorded, return to:
SBN SWFL I LLC
c/o Summit Investments Mgt.
Attn: M. Hunting
1700 Lincoln Street, Ste. 2150
Denver, CO 80203

## ASSIGNMENT OF SECURITY INSTRUMENT/MORTGAGE/DEED OF TRUST

TierOne Bank Loan No. 0111241053

FOR VALUE RECEIVED, TierOne Bank ("Assignor") hereby assigns and transfers to SBN SWFL I LLC, organized and existing under the laws of Delaware ("Assignee"), whose address is 1700 Lincoln Street, Ste. 2150, Denver, Colorado 80203, its successors and assigns, all of its rights, title and interest in and to a certain Security Instrument/Mortgage/Deed of Trust (collectively, "Security Instrument"), together with all extensions, amendments and modifications thereto, executed by __LAURENCE DINGMAN, A MARRIED MAN__, covering the following real property:

LOTS 44 AND 45, BLOCK 2425, UNIT 34, CAPE CORAL SUBDIVISION, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 16, PLAGES 74 TO 86, INCLUSIVE, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA

and filed for record in the office of the Recorder of __LEE__ County, State of __FLORIDA__ on __October 3, 2005__ in Book __N/A__, Page(s) __N/A__ and/or Instrument No. __2005000049333__, together with the Note or Notes and indebtedness described therein and secured by the Security Instrument and all rights accrued and to accrue under the Security Instrument.

IN WITNESS WHEREOF, the undersigned Assignor has executed this assignment by its officer thereunto duly authorized, and has affixed its corporate seal this 19th day of June, 2008.

ATTEST:
BY: _____
Assistant Secretary

TierOne Bank
By: _____
Lois Semerad, First Vice President

STATE OF NEBRASKA )
                  ) ss
COUNTY OF LANCASTER )

On the 19th day of June, 2008, before me, a Notary Public, personally appeared Lois Semerad, to me known who being duly sworn, did say that she is the First Vice President of TierOne Bank, a federally chartered bank and that said instrument was signed on behalf of said bank.

_____
Notary Public
My Commission expires:

MARY E. LANGTRY
MY COMMISSION EXPIRES
July 18, 2009

EXHIBIT "E"

§JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Dingman, Laurence O.

**DEFENDANTS**

SBN SWFL I, LLC

**(b)** County of Residence of First Listed Plaintiff    Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Delaware
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Brenda Cox, Esq.
Brenda Cox, P.A.
2499 Glades Road, #110
Boca Raton, FL 33431

Attorneys (If Known)

Howard Freidin, Esq.

**(d)** Check County Where Action Arose: ❒ MIAMI- DADE  ❒ MONROE  ✓ BROWARD  ❒ PALM BEACH  ❒ MARTIN  ❒ ST. LUCIE  ❒ INDIAN RIVER  ❒ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

❒ 1  U.S. Government
Plaintiff

❒ 3  Federal Question
(U.S. Government Not a Party)

✓ 4  Diversity
(Indicate Citizenship of Parties in Item III)

❒ 2  U.S. Government
Defendant

*0:09 cv 61718-zloch RSL*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ✓ 1 | ❒ 1 | Incorporated or Principal Place of Business In This State | ❒ 4 | ❒ 4 |
| Citizen of Another State | ❒ 2 | ✓ 2 | Incorporated and Principal Place of Business In Another State | ❒ 5 | ❒ 5 |
| Citizen or Subject of a Foreign Country | ❒ 3 | ❒ 3 | Foreign Nation | ❒ 6 | ❒ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❒ 610 Agriculture | ❒ 422 Appeal 28 USC 158 | ❒ 400 State Reapportionment |
| ❒ 120 Marine | ❒ 310 Airplane | ❒ 362 Personal Injury - | ❒ 620 Other Food & Drug | ❒ 423 Withdrawal | ❒ 410 Antitrust |
| ❒ 130 Miller Act | ❒ 315 Airplane Product | Med. Malpractice | ❒ 625 Drug Related Seizure | 28 USC 157 | ❒ 430 Banks and Banking |
| ❒ 140 Negotiable Instrument | Liability | ❒ 365 Personal Injury - | of Property 21 USC 881 | | ❒ 450 Commerce |
| ❒ 150 Recovery of Overpayment | ❒ 320 Assault, Libel & | Product Liability | ❒ 630 Liquor Laws | **PROPERTY RIGHTS** | ❒ 460 Deportation |
| & Enforcement of Judgment | Slander | ❒ 368 Asbestos Personal | ❒ 640 R.R. & Truck | ❒ 820 Copyrights | ❒ 470 Racketeer Influenced and |
| ❒ 151 Medicare Act | ❒ 330 Federal Employers' | Injury Product | ❒ 650 Airline Regs. | ❒ 830 Patent | Corrupt Organizations |
| ❒ 152 Recovery of Defaulted | Liability | Liability | ❒ 660 Occupational | ❒ 840 Trademark | ☒ 480 Consumer Credit |
| Student Loans | ❒ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❒ 490 Cable/Sat TV |
| (Excl. Veterans) | ❒ 345 Marine Product | ❒ 370 Other Fraud | ❒ 690 Other | | ❒ 810 Selective Service |
| ❒ 153 Recovery of Overpayment | Liability | ❒ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❒ 350 Motor Vehicle | ❒ 380 Other Personal | ❒ 710 Fair Labor Standards | ❒ 861 HIA (1395ff) | Exchange |
| ❒ 160 Stockholders' Suits | ❒ 355 Motor Vehicle | Property Damage | Act | ❒ 862 Black Lung (923) | ❒ 875 Customer Challenge |
| ❒ 190 Other Contract | Product Liability | ❒ 385 Property Damage | ❒ 720 Labor/Mgmt. Relations | ❒ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❒ 195 Contract Product Liability | ❒ 360 Other Personal | Product Liability | ❒ 730 Labor/Mgmt.Reporting | ❒ 864 SSID Title XVI | ❒ 890 Other Statutory Actions |
| ❒ 196 Franchise | Injury | | & Disclosure Act | ❒ 865 RSI (405(g)) | ❒ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❒ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❒ 892 Economic Stabilization Act |
| ❒ 210 Land Condemnation | ❒ 441 Voting | ❒ 510 Motions to Vacate | ❒ 790 Other Labor Litigation | ❒ 870 Taxes (U.S. Plaintiff | ❒ 893 Environmental Matters |
| ❒ 220 Foreclosure | ❒ 442 Employment | Sentence | ❒ 791 Empl. Ret. Inc. | or Defendant) | ❒ 894 Energy Allocation Act |
| ❒ 230 Rent Lease & Ejectment | ❒ 443 Housing/ | **Habeas Corpus:** | Security Act | ❒ 871 IRS—Third Party | ❒ 895 Freedom of Information |
| ❒ 240 Torts to Land | Accommodations | ❒ 530 General | | 26 USC 7609 | Act |
| ❒ 245 Tort Product Liability | ❒ 444 Welfare | ❒ 535 Death Penalty | | | ❒ 900Appeal of Fee Determination |
| ❒ 290 All Other Real Property | ❒ 445 Amer. w/Disabilities - | ❒ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ❒ 550 Civil Rights | | | to Justice |
| | ❒ 446 Amer. w/Disabilities - | ❒ 555 Prison Condition | | | ❒ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ❒ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

✓ 1 Original
Proceeding

❒ 2 Removed from
State Court

❒ 3 Re-filed-
(see VI below)

❒ 4 Reinstated or
Reopened

❒ 5 Transferred from
another district
(specify)

❒ 6 Multidistrict
Litigation

❒ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions
second page):

a) Re-filed Case ❒ YES ✓ NO    b) Related Cases ✓ YES ❒ NO

JUDGE Lynn Gerald - Circuit Civil State Co❒   DOCKET NUMBER 09-CA-004202 (Lee County, Florida)

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity):**

28 USC 1332 - Suit to invalidate note and mortgage procured as a result of fraud perpetrated on an elderly person.
LENGTH OF TRIAL via  2  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

❒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**
225,000.00

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ❒ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO
THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

*Brenda Cox*

DATE

October 26, 2009

FOR OFFICE USE ONLY

AMOUNT *350.00*   RECEIPT # *547902*